The next matter which is Garcia v. Bloomberg. Thank you. Ready to go? Yes, good morning. Good morning. May it please the court. Carl Messinio of the Partnership for Civil Justice Fund on behalf of appellants in this matter. The plaintiffs in this case are eight individuals who were arrested as part, within the largest mass arrest in New York City's history. While they were each engaged in free speech conduct within a police-escorted march, obeying all directives, and there's no evidence that any of these, that any of the plaintiffs have engaged or disobeyed any police directives. They didn't disobey any directive that they heard. They did not disobey any directive. There was a directive to disperse. Not to them, no. Not to them because they didn't hear it. No, there was no, they did not hear any such directive. And the officer who gave the directive issued it only to the front line of demonstrators. And what we have at this. Wait, he was saying, you 12 people who are the first row, you got to leave. Everybody else, eh. Physically, he issued it in such a way that it was audible only to. Yes, I mean, look, look, excuse me. This is sort of simple. There was an order to disperse, but it was given in such a way that not everybody heard it. Is there some reason why you can't agree to that formulation? There was an order to disperse that was known to those in command and who made the arrest decision that it was not audible to the vast majority of persons, including my clients who were so far back. Fair enough, fair enough. But there was an order. It was not issued in a way that was audible to people behind the front row. Correct. And the element I am adding to that is within the knowledge of the arresting official was the knowledge that it could not be heard by the vast majority of persons who were then subject to arrest. We are in agreement at this point. This court previously, in adjudicating this case, held that in evaluating probable cause, the court needs to look at the information possessed by the officer at the time of the arrest. The third amended complaint presents new evidence that the named defendant, Chief of Department Joseph Esposito, admittedly ordered the mass arrest and that he possessed comprehensive information at that time that would establish an absence of probable cause as well as his knowledge of justification for the persons ultimately becoming present on the roadway of the Brooklyn Bridge. The arrest also resulted because the NYPD had a policy that was created. You're saying he acknowledged that he was aware that people in the crowd took the retreat of the officers as permission? No, I'm saying that he was aware that he possessed information that established an absence of probable cause. In fact, the vast majority—he was aware that the vast— What is that information? Because I thought that the ultimate opinion of this court in the last case said that the reason that probable cause was not defeated is that at least the John Doe officers in the complaint that was before the court then had no way of knowing that the demonstrators would take the retreat of the officers as permission. And Commander—Chief of Department Esposito had a different body of knowledge. Right, and I'm asking you, are you saying that Chief Esposito at any point in any of the testimony that is the basis for the amended complaint was aware or had a reason to believe that— and acknowledged that he had reason to believe that the demonstrators understood the retreat of the officers as permission? Not that in particular. What I would point to in his testimony is that he acknowledged that he—because it was under his command— he had commanded the escort of that march. And as he attests, and it's reflected in paragraph 82 of the third amended complaint, he knew that the escort was at the front, along the sides, and the rear. He also knew that the escort continued onto the roadway of the bridge. He further attested that he was aware about the circumstance that led to the streaming of many hundreds of persons onto the roadway of the bridge, including new information that he knew that there was no person with a bullhorn that was there, that he consciously and deliberately did not deploy resources to demonstrate, signal, or dissuade persons from streaming forward, and that he knew, in fact— Is that the—when he says he made a mistake, a tactical mistake, by not putting scooters or cars or something to block the march and just having a thin blue line instead? It is not—it is referring to that element of testimony, but it is important to recognize that he understood that this was a police-escorted march from the beginning and all the way through to the end. And a picture is worth a thousand words in this respect, as reflected on page 3 of the reply brief. That march was escorted, and he understood this because it was under his command, all the way onto the roadway of the bridge. Placing that information in his mind at the time of the arrest distinguishes him materially from the DOE officers who were not charged with such comprehensive information, and it alters the outcome of the probable cause analysis, because he knew that persons followed within a then-police-escorted march onto the roadway of the bridge. Having that knowledge, that information, establishes that he knew legitimate justification for those persons being there. And in a way, what occurred at that front line with the turning and advancing was not even relevant to what was perceived by the many hundreds of persons who, as Pazito was aware, stretched so far back that they were standing on the sidewalks walking around City Hall Park at the time that that occurred. So that when he conducts an arrest of these 700 persons, he knows how they got there. This is something that the DOE defendants did not possess, and the knowledge, having come upon what the Court recognized that from their splintered perspective was a confused scene, but from the perspective of the Chief of Department, it was anything but confused, because he was in full command from beginning to the end. He was aware that it was the police who had blocked off Center Street. He was aware that it was the police who blocked traffic to the roadway of the bridge, because he himself gave the order. He was also aware of the policy, because he formulated it along with Commissioner Kelly, that authorized the arrest of protesters who had been marching in a police-escorted and sanctioned Occupy Wall Street march without clear and ambiguous notice that sanction had been revoked. Can we go back for a second? Of course. It seems as if what was important in this Court's decision was, based on Cox and other cases, that there was no specific permission given by the police for the protesters to proceed on the roadway. And so you went back and tried to fix that with the third amendment complaint, and I'm having trouble understanding the allegations of it to try to address that issue. For example, New Paragraph 40 says, The police conveyed actual or apparent permission or sanction for plaintiffs to engage in marching activity, in general, as well as movement onto the roadway of the Brooklyn Bridge. What does that mean? Are you alleging now the police gave permission overtly to the protesters that they could proceed on the roadway? Absolutely. Where? Through the escort. Isn't that exactly what he denied in his deposition, that this was any kind of permission? He said, we just couldn't stand there anymore because they were coming one way or the other. And he knew that the many hundreds who followed and streamed onto the bridge did so under police escort. And I think it's very important to step back. In terms of sanction and permission, Kelly and Esposito formulated a policy, they reinvigorated a policy that they previously had in place during the 2004 RNC, during another time of active protest activity, where they actually sanctioned unpermitted and otherwise unlawful protest marching activity. He knew about that. No good deed goes unsued. You're asking them to basically take the position that you don't get a permit, we're going to arrest you as soon as you step off the Zuccotti Park sidewalk. The reason why there is a civil rights and First Amendment violation is not because of the permission and the discretion to allow them to march, but because there is a constitutional defect in that policy, which was brought to their attention by the CCRB previously, which is that that policy contemplated and authorized the arrest of those same marchers without there being notices when that sanction was, for whatever reason, good, bad, or otherwise, revoked. And as a consequence of that, this is what leads to the 700 persons moving onto the bridge, never being given notice that, yes, while actual sanction, actual permission, has indeed been allowed throughout the morning. Do you have to tell everybody? Do you have to go person by person and say it's been revoked, get off the bridge? It's clear in the case law that that notice prior to the condition, prior to the exercise of arrest needs to be communicated to those who are subject to arrest. Okay, thank you. I know you've reserved a few minutes. We'll hear from Mr. Deering. Thank you. May it please the Court, Richard Deering for the appellees. This case is no different from the appeal this Court decided the last time. The events are documented thoroughly on videos. Nothing that is alleged in the third amended complaint goes to the question Your Honor identified, whether Esposito had awareness that the retreat of that thin blue line on the entry to the bridge would be understood as a grant of permission. This is a groundhog's day of the first appeal. The question, the first important one, was permission given? This was a march that was on the sidewalks the entire way, with repeated statements, stay on the sidewalks all the way to the bridge. These protesters, the only ones who were arrested, were on the roadway of the Brooklyn Bridge. Many protesters went over the pedestrian walkway of the Brooklyn Bridge and were not arrested. There was never permission to go over the roadway. Well, paragraph 135 of the new complaint, third amended complaint proposed, says police permitted or conveyed permission for the march to proceed upon the roadway of the bridge by escorting the march and leading the march thereupon. So in the absence of the videos that are part of the record, wouldn't that be enough to meet with a 12b-6 motion on qualified immunity? It's awfully conclusory, and it is a legal conclusion, but I think the exception of the video is an awfully large one. In this case, in the first appeal, the videos loom large, and they loom large again here. They depict very clearly what happened. Admittedly, the act is, as the court said in its first appeal, inherently ambiguous, the point being this differs from a case where permission is given and then must be revoked. This is a case, as the court decided before, where there's no meaningful dispute that the elements of disorderly conduct, and in this case blocking a major vehicular roadway, were satisfied. The question is, is there a defense here? My question was this, though. Would this allegation I just read to you be enough to keep the case going? I'm doubtful that it would be. Let me finish my question, okay, since you didn't answer it the first time. The question is, would that allegation be enough but for the videos? The videos seem to contradict that allegation. Is it your position that we have to look to the videos to see if that allegation is believable, is plausible? Two parts. No, it would not be enough absent the video. Two, the video conclusively eliminates really the relevance even of that allegation. It wouldn't be enough absent the video because it is conclusory. You'd need more specific allegations that explain what that means, not just that permission is given. But in any case, the video exists here, and certainly that form of generalized allegation, the teeth of the video, particularly after the case has been up to this court and resolved once, is not enough. And we're really back where we began in the last appeal, which is there's at best some ambiguity whether these individuals had a defense to the disorderly conduct charge. Plaintiffs themselves say, when we're talking about the retreat, they didn't even see that retreat, these eight plaintiffs. That's explicitly stated on the reply brief at 8. Not one plaintiff was present to perceive what occurred at the base of the on-ramp. So this is nothing in Chief Esposito's testimony creates any difference in fact, in relevant facts, from what was before the court before. Has anyone been convicted of disorderly conduct? To my knowledge, among these protesters? Yeah. To my knowledge, no. And as far as we know, all those charges have ultimately been dropped? As far as I know. The information I saw was that many, all but 20, may have been dropped within a day. And then I don't know what happened with the remaining 20, but as far as I know, no conviction, certainly not many. I'd just touch briefly on the second point, which is Monell, which is really an independent ground for resolving this case. Just parenthetically, Esposito was an officer depicted on the videotape. So Esposito, he's been named now. He wasn't named before, but the conduct of Esposito was before this court on the videotape in the first appeal. So I would say Chief Esposito has qualified immunity on the strength of that, even if probable cause were bracketed for a second from the decision in the first appeal. So to get beyond this, as did the Doe officers clearly, even if there were probable cause, there would have to be an adequate Monell allegation. Do you believe that probable cause was found by this court, probable cause for the arrest of disorderly conduct in the first decision? I think it was. The two major premises of the court's decision were both rooted in the law of probable cause. The first was an explicit statement, a statement that it's not subject to serious dispute. This is at page 92 of the first opinion, not subject to serious dispute. The elements of disorderly conduct was satisfied. Then the second premise on the question of defense at page 93 of the opinion, at most the law of probable cause is defeated if officers deliberately disregard facts known to him, which establish justification that in that section of the opinion, the court cites Jocks and Curley, both of which were addressing the question of probable cause at that point, not qualified immunity. But there was probable cause found by this court for all the arrests. Is there any chance of Monell liability? No. That's a sufficient basis to resolve the entire appeal, probable cause found by the court in the first appeal. I'm offering a second independent ground for resolving the appeal that there's not adequate Monell allegations in any case. Well, that's for resolving the appeal against the city. That wouldn't resolve the appeal against Esposito. That would have to come from the first point that you made, right? It would or qualified immunity still in play as to him. But, I mean, when you say the Monell, the absence of an adequate Monell allegation resolves the appeal, it resolves the appeal against the city if we agreed with your point. Fair enough. It resolves the appeal against the city, and Chief Esposito as an individual defendant always can revert back to the QI standard. So just to touch on Monell, all we have really here, this is really two theories of Monell liability. One is to rely on that narrow, very narrow path where a single act by a final policymaker can be sufficient. The second is a claimed policy based on highly divergent past acts. Why isn't Chief Esposito a policymaker, though? I know you've cited some of the ordinances in the charter of New York City, but he certainly had the authority to order the arrests, mass arrests, and the biggest demonstration in decades, right? Sure. Why isn't he a policymaker of that himself? The court's decision in Anthony v. City of New York, 2003, decision-making authority over officers on the scene, not enough to make Monell. Yeah, but he's also the chief. Well, the chief, but not a charter designated officer, not a statutorily designated officer subsidiary to the charter vested authority of the police commissioner. So Kelly is the only policymaker in the department? Yes, and there's nothing particularly extreme about that position. In fact, there is no prior decision of this court that has held a second ranking officer, that have been cited by plaintiffs, that has held a second ranking officer within an agency to be a final policymaker for Monell. That's a very high and restrictive standard. And I'd point out that in the Jeffers case, a county sheriff was found to be final policymaker, because it was an elected official autonomous from any control within another agency. So I would say, at best, it's Kelly. And the allegations as to Kelly are generalized and scanned. And we move on to the question of pattern. And I want to get to the CCRB point because I think it's important. And really, the blueprint for resolving that is Judge Rakoff's first decision, prior to the first appeal, where he walked through the allegations under Monell, insofar as they alleged a pattern of conduct like this, and found that the pattern alleged was generalized and dissimilar from the events of this case. And specifically because so many protesters were allowed to continue marching and not arrested on the pedestrian walkway, and that this case presented the distinctive and not before presented question of protesters who went on. I've never heard of this happening before, protesters who went on and blocked a river crossing on the Brooklyn Bridge. And just to touch on the CCRB findings, 2006, that are repeatedly cited by the plaintiffs. It's a two-page letter issued by the CCRB in 2006. And with that, you know, sometimes officers are fighting the last war, and I'd say that's what's relevant about the CCRB findings. They described arrests made on sidewalks. They described dispersal orders where no bullhorn was used. Their recommendation specifically, use a bullhorn in that. And they described dispersal orders that were confusing, meaning an officer said, get off the streets, when what he really meant is also get off the sidewalks. Here, the dispersal orders given on the videotape are not confusing. They're clear. The officer read them from a script, read them very carefully. He then revised them and made them more pointed after the continued refusal to move in the locking arms of the front ranks of protesters. So the CCRB findings have no real relevance under Monell. The recommendations of the CCRB were complied with in this instance. This case presented a different variant, a different and new variant, where protesters attempted to go over and occupy the vehicular roadway of the Brooklyn Bridge. The officers had probable cause to arrest them. Even failing that, there's no basis for Monell liability against the city, and Chief Esposito would definitely be entitled to qualified immunity. Thank you. Thank you. You've reserved a couple of minutes, three minutes. The issue here is escort. The issue is escort and the video. Escort was what the first case was about. The ruling on the first time up here on interlocutory appeal focused on the DOE defendant's knowledge and did focus very much on the turning of the front police line. However, now we have a different base of knowledge, with Chief Esposito admitting that there was an escort all the way through, and the escort is, in fact, what demonstrated. Look, I have an intimate familiarity with the last litigation here, right? Yes. I don't remember anyone ever disputing that the march was escorted until it got to the bridge. That's not new. That is not new, but viewed from the perspective of the DOE defendants, the court recognized the unidentified DOE officer. Including any officer who basically put the cuffs on somebody who may have shown up from a precinct in Queens 10 minutes before the arrest. Right. Okay. Right. They knew nothing about anything. That is correct. There was no particularized knowledge because they were practically fictional, and there was no actual identified officer. But when you bring in Chief Esposito's knowledge, that particularizes the knowledge. He knew that there was an escort. He also knew that there was an escort that proceeded onto the roadway, the bridge. That sounds like my first opinion, that they made me eat. Because that's essentially what that first opinion that was withdrawn said, was that there are different officers and they have different degrees of knowledge, and so we can't say there was no qualified immunity as to everyone because we don't know who we're talking about. And we are not talking about everyone or unidentified persons. We are focused only on the command staff who had unified information within their knowledge. That is the operative fact that distinguishes the presentation and the posture of the third amended complaint from the second amended complaint. There was no particularized knowledge, which is a facet of how that case came up with only John Doe defendants. But now it's presented with very specific knowledge coming from the command staff. They know and they admit knowing of the escort. And with respect to the video, the video does need to be interpreted in the light most favorable to the plaintiff at this point. And you can look at the whole video, but looking at page three of that reply brief is pretty clear. Those are escorting officers. Those are escorting officers and quite reasonably understood as that. And when a person comes upon a peaceful march that is being escorted by the New York City Police Department, under the First Amendment, they think, and rightfully so, that they may join and continue in that march. And if the First Amendment means anything, it offers them that protection. And it restrains the police only minimally that under the circumstances presented in this case, they simply need to give orders. It doesn't mean anything else. They must give orders before the exercise. How practically could they give that order to the people like your clients at the back of the march? What do you have in mind? There's multiple ways they could have done it at multiple points in time. Give me one. Just give me one. Sure. But don't give me multiple points of time. When we're at the bridge, the police are saying, disperse. It was fine to be marching down the sidewalks, but you can't block the roadway. When that's being announced through a bullhorn, not a great bullhorn, a very large crowd, what do we need? We need big sound equipment. Is that the story? There's two points in time that are relevant. That one point and also at the time right before the execution of arrest. At that point in time, they could have used mesh. They could have used motor scooters. They could have kept Captain Jaskarin at the base to use his bullhorn to warn people, never mind what you see. You are not permitted to proceed here. We are not escorting. This is now an illegal procession if you continue in this way. Now, at the other critical moment, at the time of the execution of arrest, when there's no issue that they had control over all of those persons, at that time they could have given them an opportunity. They could have said, no matter how you got here, we are telling you that you may not stay present on this roadway. You turn yourselves right back. We have provided you an avenue, an avenue to exit this roadway. You don't take it. You are under arrest. That would have satisfied the constitutional requirements of providing notice. Anyone that willfully disobeyed that unquestionably is violating the law. That would be consistent with the precedent in VODAC, in Dellums, and in Buck, all of which in these circumstances hold that where the police acquiesce or give actual or apparent sanction for people to engage in First Amendment protected activity that they need, the burden falls on the police then to give notice and opportunity to comply with dispersal or similar orders before they engage in arrest. Thank you. We'll reserve decision. Our next case is on the papers, so I'll ask the clerk to adjourn the court. Court is adjourned.